CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

May 07, 2024

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| TAMMY YANEZ, as Administrator of the Estate of BRITTNEY SHILLINGBURG, | ) ) ) |
| Plaintiff | ) ) |
| v. | ) Case No. 5:24-cv-25 |
| | ) |
| CHRISTINE WALKER, LPN, CRYSTAL CARUSO-WILSON, LPN SARA HENSON, LPN ALLISON PALMER, CNA | ) ) ) ) ) |
| Defendant(s) | ) |

## COMPLAINT

The Plaintiff, Tammy Yanez, as Administrator of the Estate of Brittney Shillingburg, by counsel, hereby respectfully moves this Court for judgment against Defendants Christine Walker, Crystal Caruso-Wilson, Sara Henson, and Allison Palmer. In support of this request, Plaintiff states as follows.

## JURISDICTIONAL STATEMENT

1. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) over Plaintiff's 42 U.S.C. § 1983 claim asserted herein.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

3. Assignment to the Harrisonburg Division of the Western District of Virginia is proper pursuant to Western District of Virginia Local Rule 2(a)(5) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## SUMMARY OF THE CASE AND PARTIES

4. The allegations set forth in this Complaint arise out of injuries, suffering, and death endured by Ms. Shillingburg while incarcerated at the Rappahannock, Shenandoah, Warren County Regional Jail ("RSW").

5. Ms. Shillingburg was, at all relevant times, an inmate at RSW who had been previously diagnosed with Congenital Adrenal Hyperplasia (CAH). CAH is a genetic disorder of the adrenal glands and individuals diagnosed with CAH require continuous hormone replacement medication to avoid life-threatening consequences.

6. Particularly, individuals with CAH require glucocorticoid replacement therapy. Often this therapy is accomplished through administration of hydrocortisone.

7. Ms. Shillingburg was admitted to RSW on October 18, 2022, at which time an "Initial Health Screening" was conducted by LPN Christine Walker.

8. Prior to her October 18, 2022 admission, Ms. Shillingburg had previously been incarcerated at RSW. Her medical chart shows that as recently as May 2021, she was incarcerated at RSW and, during that incarceration, oral hydrocortisone medication had been ordered to treat Ms. Shillingburg's CAH. In fact, on May 20, 2021, her chart indicates:

> *IM has adrenal insufficiency and supposed to be on hydrocortisone 20mg in AM and 10 mg in PM.*

Accordingly, at all relevant times, RSW staff knew or should have known about Ms. Shillingburg's CAH diagnosis and that she needed glucocorticoid replacement by virtue of the information plainly documented in her medical chart.

9. Despite this, RSW records show that Ms. Shillingburg was not offered any hydrocortisone from October 18, 2022, through the morning of October 21, 2022, even though Ms. Shillingburg was in possession of 42 tabs of hydrocortisone medication on admission.

10. When the medication was offered, Ms. Shillingburg initially refused to take it, because she did not want to take hydrocortisone if it was "floated."[1] RSW staff cited that it was "jail policy" to float all medications, but it is unclear why this policy could not be waived to allow Ms. Shillingburg to take life-saving medication. Consequently, Ms. Shillingburg did not receive her medication from the evening of October 21, 2022, until the evening of October 25, 2022.

11. Ms. Shillingburg's family got word that she was not receiving her hydrocortisone due to it being floated, resulting in Dr. Silas Culver from UVA calling RSW on October 25, 2022:

> Date: 10/25/2022 11:37                    Author: LPN Walker, Christine
> Pt. MD from UVA called, he is concerned that pt. has not been taking her meds as prescribed. Family has told Dr. Culver that it is d/t meds being floated. Explained to him that it was jail policy to do this.
> **Dr. Culver then stated he was concerned about her living, as this med is a life sustaing med.**
> He asked about the MD's here. He was informed that one would be in tomorrow. He would like to speak to one concerning pt.

12. Despite this note, there is nothing in the available medical records demonstrating that LPN Walker communicated this critical information to anyone, much less a doctor. There is also nothing in the available medical records indicating that any medical doctor ever spoke with Dr. Culver.

13. During the PM medication administration on October 25, 2022, the following note appears:

---

[1] "Floating" refers to the practice of crushing or powdering medication and suspending it on the surface of liquid, typically water, before administering it to a patient.

> Date: 10/25/2022 14:33   Author: LPN Walker, Christine
> Pt. refused vs at this time. Spoke to pt again about the importance of taking her meds. **She did agree to take meds if water was put on them right before taking, and not have them sitting in water for a long period of time.**

That same day, Ms. Shillingburg reported that she was dehydrated.

14. On October 26, 2022, Dr. Culver called again and spoke to the Director of Nursing, James Sokol, RN, indicating that the hydrocortisone should not be floated at all.

15. Following this conversation, RN Sokol informed the nursing staff that Ms. Shillingburg's hydrocortisone was not to be floated. RN Sokol then spoke to RSW Superintendent Russell Gilkinson and Assistant Superintendent Weave, who agreed that Ms. Shillingburg's hydrocortisone would no longer be crushed and floated. This indicates that RSW's policy of floating medications could, in fact, have been waived immediately after Ms. Shillingburg first informed RSW staff that she would only take her hydrocortisone "un-floated."

16. Thereafter, Ms. Shillingburg accepted her hydrocortisone administrations "un-floated."

17. Unfortunately, as a result of the gap in receiving her medication, Ms. Shillingburg began to go into adrenal crisis.

18. Symptoms of Ms. Shillingburg's adrenal crisis began to manifest throughout the day on October 26, 2022, as reports were made to LPN Sara Henson and LPN Crystal Caruso-Wilson that Ms. Shillingburg:

- Had no appetite;
- Could not tolerate food, despite trying;
- Was feeling light-headed;
- Was dizzy;
- Was nauseous;

- Felt acid in her throat and her stomach;

None of this appears to have been communicated to any doctor, despite Dr. Culver having left his telephone number which was documented in the chart. Instead, she was given Mylanta, water, and Gatorade and told that she "was on to see the Dr in the morning."

19. According to the medical record, however, Ms. Shillingburg did not "see the Dr in the morning" on October 27, 2022, or at any point during that day. Nor does it appear that any medical doctor or other provider was informed or consulted regarding Ms. Shillingburg's condition. According to the medical record, the following interacted with Ms. Shillingburg on October 27, 2022:

- Katharine A. Castillo, LPN[2]

- Crystal Caruso-Wilson, LPN

- Allison Palmer, CNA[3]

These individuals were informed throughout the day that Ms. Shillingburg:

- Was having trouble standing up;

- Was exhausted;

- Was unable to eat or drink;

Despite this, no medical doctor or other provider was informed or consulted. Instead, Ms. Shillingburg was told to "try small sips" of water and "small bites of food." She was offered "Mylanta to see if that would help."

20. The following note appears on October 28, 2022 at 7:20 AM:

---

[2] Although her name is spelled "Katherine" on the medical chart, a search of VDHP licensing revealed "Katharine" as the proper spelling.

[3] Ms. Palmer is referred to as a "Med Tech" in the chart. The VDHP license search indicates that she was first licensed as a Nurse Aide on August 30, 2023.

> Date: 10/28/2022 07:20    Author: LPN Walker, Christine
> Called to intake to check pt. for c/o chest pain.
> Upon arrival pt. was laying down and did not appear to be in any distress. Pt. walked to door. Skin w/d. When asked what was going on, pt. only stated "I'm freezing"
> Unable to obtain VS d/t pts. movement. Was going to attempt VS manually, but she turned and walked back in cell and laid down.

Ms. Shillingburg further reported that she had low energy, was nauseous, and had difficulty breathing.

21.     Incredibly, however, LPN Walker never informed or consulted with any medical doctor or other provider regarding Ms. Shillingburg's alarming condition. Ms. Shillingburg never saw another nurse or medical provider until her death.

22.     Subsequent video footage from Ms. Shillingburg's cell on October 28, 2022 shows Ms. Shillingburg in significant distress and physical deterioration throughout the remainder of the day, many times laying on the floor or keeling over her toilet. She alternated between sitting and laying on the bare floor and under her blanket covers in the fetal position. At 1:11 PM she appeared to vomit. From 1:54 PM to 2:00 PM, Ms. Shillingburg appeared to lay in the fetal position in front of her cell door.

23.     At 2:56 PM, a guard entered Ms. Shillingburg's cell to give her a cup of water. Ms. Shillingburg was unable to stand. At 2:58 PM, Ms. Shillingburg rolled over on her back, and appeared to go limp. She did not move from 3:02 PM, until guards re-entered her cell to check on her at 3:38 PM.

24.     When she was finally checked on at 3:38 PM, RSW medical and security staff attempted chest compressions and continued until EMS arrived, and Ms. Shillingburg was transported to Winchester Medical Hospital.

25.     Prior to her cardiac arrest, Ms. Shillingburg was estimated to have been unresponsive for 1 hour. After she was brought to the hospital, she went into cardiac arrest for

another 30 minutes. Ms. Shillingburg was then transferred to Winchester Medical Center ICU with significant vasopressor requirements.

26. She suffered from shock liver and renal failure, and remained unresponsive to stimuli with fixed and dilated pupils. From the evening of October 28, 2022 into October 29, 2022 Ms. Shillingburg continued to require significant amounts of vasopressor support. After she continued to decline, her mother and two brothers made the decision to transition to comfort measures. Ms. Shillingburg died shortly thereafter.

27. An autopsy report indicated Ms. Shillingburg's cause of death was complications of congenital adrenal hyperplasia.

28. Had Ms. Shillingburg's condition been reported to any objectively reasonable doctor, including specifically Dr. Culver, it would have been discovered that she was in the midst of a life-threatening adrenal crisis.

29. The hallmark symptoms of adrenal crisis include fatigue, nausea, vomiting, body aches, dizziness, headache, change in mental status and low blood pressure. From October 26 until October 28, Ms. Shillingburg suffered from most if not all of these symptoms.

30. During acute illness, such as Ms. Shillingburg was experiencing, simply increasing her medication by 2 or 3 times her normal dose would have prevented her deterioration. Were she unable to ingest the medications or if the increased dosage did not alleviate her symptoms, transfer to the hospital would have been ordered by any objectively reasonable physician.

31. Hospital therapy for patients with acute adrenal crisis includes intravenous fluid and glucocorticoid administration.

32. In the absence of adequate hormone replacement therapy, adrenal crisis can be lethal, as it was in this case.

33. Accordingly, adrenal crisis is a medical emergency.

## COUNT I
### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
*Defendant(s) Walker, Caruso-Wilson, Henson, and Palmer*

34. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

35. At the time of the events detailed in this Complaint, Ms. Shillingburg was a pre-trial detainee. As such, her rights to humane conditions of confinement, including timely access to adequate medical care, were secured by the Fourteenth Amendment of the U.S. Constitution.

36. Defendants LPN Walker, LPN Caruso-Wilson, LPN Henson, and CNA Palmer were each acting under color of state law during their interactions with Ms. Shillingburg, and were required to provide Ms. Shillingburg with constitutionally adequate medical care for her objectively serious medical needs.

37. Ms. Shillingburg's medical condition was at all times objectively serious while she was under the care of Defendants.

38. In particular, in the period between October 25 and 28, Ms. Shillingburg presented with serious, life-threatening symptoms of adrenal crisis that were increasing in severity. Further, the symptoms were consistent with symptoms of adrenal failure, a consequence of an untreated disease CAH from which Defendants knew Ms. Shillingburg suffered.

39. Defendants each had access to Ms. Shillingburg's chart, where information was readily available regarding her CAH diagnosis and her need for administration of hydrocortisone. It was also apparent from the chart that Ms. Shillingburg's condition could be life-threatening if not managed properly.

40. Defendants were each indifferent to Ms. Shillingburg's condition and her need for a doctor's evaluation and care. Each defendant had an opportunity and an obligation to provide Ms. Shillingburg with access to physician care and chose not to do so. In fact, each Defendant deliberately chose not to even consult with a physician regarding her symptoms, despite specific instructions in her chart that a physician needed to be involved in her care in order to prevent serious, potentially life-threatening consequences.

41. Each Defendant knew that they were not licensed to provide medical care to Ms. Shillingburg or to make life or death decisions about her medical needs.

42. Had any of the Defendants simply reported any of these symptoms to a doctor, any objectively reasonable doctor would have ordered treatment for Ms. Shillingburg's adrenal crisis.

43. Defendants knew or should have known that Ms. Shillingburg's symptoms were so serious that even a lay person would have easily recognized the need for a doctor's attention. In fact, Dr. Culver provided information that Ms. Shillingburg's life was at risk and that she needed to be seen by a doctor, something that was recorded in her chart along with his phone number. Despite this, Defendant's took no action to provide Ms. Shillingburg access to a physician or to even discuss her condition with a physician.

44. At all times after October 25, Defendants were subjectively aware that failure to treat CAH threatened Ms. Shillingburg's life, and that CAH, if left untreated, dramatically increased her risk of life-threatening complications or death.

45. Defendants were subjectively aware that Ms. Shillingburg refused to take hydrocortisone because it was floated per jail policy, and that these refusals significantly increased the danger that Ms. Shillingburg would experience a serious medical emergency related to her CAH.

46. Defendants knew that failure to treat Ms. Shillingburg's CAH could lead to death or serious bodily injury, because Dr. Culver communicated this and it was documented in her chart. Defendants also knew how serious Ms. Shillingburg's symptoms were and knew that the minimal treatment she was receiving was largely ineffective.

47. Despite this knowledge, Defendants declined to do anything more for Ms. Shillingburg, refusing to take even the most basic step of reporting Ms. Shillingburg's symptoms to a doctor. In doing so, Defendants disregarded the excessive risk to Ms. Shillingburg's health, especially as she displayed multiple symptoms of decline from October 26 to her death on October 28.

48. Each Defendant's refusal to administer Ms. Shillingburg's medication via alternative methods, refusal to consult with any specialist, refusal to send Ms. Shillingburg offsite for any evaluation or treatment, and refusal to send Ms. Shillingburg to the hospital even after she asked for outside medical care constituted deliberate indifference towards Ms. Shillingburg's objectively serious medical needs.

49. As a direct and proximate result of Defendants' refusal to offer Ms. Shillingburg timely, adequate, and compassionate medical care, Ms. Shillingburg suffered from complications of untreated CAH, resulting in adrenal crisis. As a result, Ms. Shillingburg suffered and then died unnecessarily.

50. Each Defendant's indifference was conscious and deliberate, thus warranting an award of punitive damages.

## COUNT II
*Medical Negligence*
*Defendant(s) Walker, Caruso-Wilson, Henson, and Palmer*

51. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

52. Defendants had duties to administer medical care and treatment to Ms. Shillingburg in conformity with the standards of delivery of medical care and treatment in the Commonwealth of Virginia.

53. Defendants were aware that Ms. Shillingburg suffered from serious mental health conditions that prevented her from making proper decisions to ensure her own safety.

54. Throughout their care and treatment of Ms. Shillingburg, each Defendant had a duty to exercise reasonable care and to comply with the standard of care set forth in Va. Code § 8.01-581.20.

55. Defendants each had a duty to provide adequate care to Ms. Shillingburg, including providing her access to physician care and not otherwise ignoring her obvious and serious medical condition.

56. Each Defendant breached their duty to Ms. Shillingburg as described in the Complaint and, specifically, by:  failing to properly evaluate her symptoms, failing to provide her any meaningful care in response to her symptoms, ignoring instructions to communicate with a physician regarding her care, ignoring the need for her to be seen by a doctor, ignoring the need for her to be sent to the hospital, and otherwise denying her any opportunity to have access to necessary medical care.

57. As a direct and proximate result of the actions and/or omissions of Defendants, Ms. Shillingburg suffered unnecessary physical pain and mental anguish and, ultimately, died.

58. As a direct and proximate result of the grossly negligent conduct of Defendants, the surviving beneficiaries of Ms. Shillingburg have suffered and will continue to suffer sorrow, mental anguish, loss of companionship, loss of comfort and guidance, medical bills, funeral bills, loss of income and support, and other related bills and expenses.

## WRONGFUL DEATH DAMAGES

59. Ms. Shillingburg suffered a wrongful death and therefore her Estate has claims pursuant to Virginia Code § 8.01-50 for damages as set forth in Virginia Code § 8.01-52.  She is survived by statutory beneficiaries as set forth in Virginia Code § 8.01-53.

60. As a direct and proximate result of the indifferent and grossly negligent conduct by all Defendants, Ms. Shillingburg's Estate and her statutory beneficiaries suffered compensable wrongful death damages.

61. WHEREFORE, based upon the foregoing, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount in excess of ONE MILLION DOLLARS ($1,000,000.00), for compensatory damages, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees. Plaintiff further demands punitive damages in an amount to be set by the jury. Plaintiff demands such other relief as is lawful, just and proper.

**TRIAL BY JURY DEMANDED.**

Respectfully filed,

**TAMMY YANEZ, as Administrator of the Estate of BRITTNEY SHILLINGBURG**

/s/
Seth R. Carroll (VSB No. 74745)
Commonwealth Law Group, LLC
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 999-9999
Facsimile: (866) 238-6415
scarroll@hurtinva.com