UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| TAMMY YANEZ, Administrator of the Estate of Brittney Shillingburg, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No.: 5:24-cv-25 |
| CHRISTINE WALKER, et al., ) ) | |
| Defendants. ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CARUSO-WILSON'S, HENSON's, AND PALMER'S MOTION TO DISMISS**

Plaintiff, by counsel, files this Memorandum in Opposition to Defendants' (Crystal Caruso-Wilson LPN, Sara Henson LPN, and Allison Palmer CNA) Motion to Dismiss.  Because the Defendants' plea of sovereign immunity is largely analytically indistinguishable from the same plea filed by Defendant Walker, Plaintiff incorporates her opposition in response to Defendant Walker (ECF No. 24) by reference on those points.  For the following additional reasons, Plaintiff respectfully asks the Court to deny the Defendants' motion in its entirety.

**ARGUMENT**

1. **Plaintiff States a Plausible Claim for Deliberate Indifference Against the Defendants.**

Defendants offer two short arguments in support of their position that the Court should dismiss the Plaintiff's Fourteenth Amendment deliberate indifference claims.  First, Defendants argue that Plaintiff's allegations only demonstrate "disagreement" with Ms. Shillingburg's course of treatment and are therefore insufficient to support a claim for deliberate indifference.  ECF No.

22 at 5.  Second, Defendants argue that Plaintiff has failed to allege they had actual knowledge of Ms. Shillingburg's serious medical need.  6-7.

Insofar as Ms. Shillingburg's "disagreement" with her medication administration is concerned, Plaintiff is not basing her claims against the Defendants on their failure to provide Ms. Shillingburg medication in the manner she requested it.  However, the factual background of the "disagreement" between Ms. Shillingburg and medical staff regarding the manner of administration of her hydrocortisone serves as important context for the corresponding presentation of Ms. Shillingburg's serious medical symptoms.  In other words, the gap in hydrocortisone administration directly correlated with Ms. Shillingburg's worsening medical condition, as predicted by her physican.  This connection is relevant both to the obviousness of Ms. Shillingburg's serious need for medical attention and the Defendants' indifference to the same.

In arguing for dismissal, Defendants misstate the standard that applies for deliberate indifference claims brought under the Fourteenth Amendment in the context of pre-trial detainees.  For example, Defendants expressly assert the following as the controlling legal framework:

> *To show deliberate indifference, the defendant must have had **actual subjective knowledge** of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction… Furthermore, **it is not enough that an official should have known the risk**, he or she must have had **actual subjective knowledge** of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.*

ECF No. 22 at 6 (emphasis added and internal citations omitted).  However, "Ms. Shillingburg was a pre-trial detainee," at the time the events set forth in the Complaint took place.  ECF No. 1 at ¶ 35.  As such, her claims arise under the Fourteenth Amendment.  Id.  Despite this, Defendants completely ignore the Fourth Circuit's holding in Short v. Hartman, which holds that evaluation of deliberate indifference claims brought by pre-trial detainees must apply an *objective* standard.  Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023).  In Short, the Fourth Circuit held, "[o]ur

subjective deliberate indifference test for pretrial detainees' Fourteenth Amendment claims is *irreconcilable* with the Kingsley-Bell objective test." Id. at 609 (emphasis added). In clarifying its holding, the Fourth Circuit explained:

> *The plaintiff **no longer has to show that the defendant had actual knowledge** of the detainee's serious medical condition and consciously disregarded the risk… [but rather] must show that the defendant **should have known** of that condition and that risk, and acted accordingly.*

"Id. at 611 (emphasis added). In her Complaint, Plaintiff alleges that Ms. Shillingburg had a condition known as Congenital Adrenal Hyperplasia ("CAH"), which required management with hydrocortisone medication in order "to avoid life-threatening consequences." ECF No. 1 at ¶¶ 5-6. Plaintiff further alleges that Ms. Shillingburg's condition and need for medication management was well documented in her chart by virtue of prior incarceration at RSW Regional Jail ("RSW"). Id. at ¶ 8. Therefore, "RSW staff knew or should have known about Ms. Shillingburg's CAH diagnosis and that she needed glucocorticoid replacement by virtue of the **information plainly documented in her medical chart**." Id. (emphasis added).

In this context, the "disagreement" over medication administration becomes relevant, because the medication administration and encounter notes in Ms. Shillingburg's chart show that she failed to receive this life-sustaining medication for nearly one week following her incarceration. Id. at ¶¶ 10-11. The medication lapse led to a call from Ms. Shillingburg's outside treating physician, Dr. Culver, who "stated he was concerned about her **living**, as this med is a life sustaining med." Id. at ¶ 11. This statement from Dr. Culver about the seriousness of Ms. Shillingburg's condition was documented in her chart. Id. Subsequently, RSW staff decided to give Ms. Shillingburg the medication in a manner that she would accept, but "as a result of the gap in receiving her medication, Ms. Shillingburg began to go into adrenal crisis." Id. ¶ 16.

It is at this point that the Defendants' deliberate indifference to Ms. Shillingburg's objectively serious medical condition manifests.  Against the background of numerous notes in Ms. Shillingburg's chart regarding her serious condition and need for medication management, a documented one-week gap in medication administration, and a physician's warning that such a disruption of her medication could threaten her life, Defendants were aware that Ms. Shillingburg had the following symptoms:

*Loss of appetite;*

*Inability to eat;*

*Light-headedness;*

*Dizziness;*

*Acid in her throat and stomach;*

*Nausea;*

*Exhaustion;*

*Difficulty standing.*

Id. at ¶¶ 18-19.  Despite their knowledge of these serious symptoms and the information the danger to her life documented in her chart, Defendants did not consult with or inform any provider about how to care for Ms. Shillingburg's condition, but rather told Ms. Shillingburg to try "little sips of water" or "little bites of food" and offered her Mylanta.  Id. ¶¶ 19.

There is no question that Ms. Shillingburg was experiencing an objectively serious medical need at the time they were confronted with these symptoms.  In fact, it was documented in her chart that a physician warned that Ms. Shillingburg's life could be in danger due to medication disruptions.  See Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (holding that the objective prong of the deliberate indifference test is satisfied if the medical need has been "diagnosed by a

physician as mandating treatment" or is otherwise obvious."). Further, it is clear from these factual allegations that the Defendants "should have known of [Ms. Shillingburg's] condition and [her] risk, and acted accordingly." Short, 87 F.4th at 611. Moreover, the allegations regarding Defendants action and inaction is more than sufficient to support a claim for deliberate indifference:

> *As to adequacy of care, a "prisoner can establish a claim of deliberate indifference 'by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment.'"* King v. United States, *536 F. App'x 358, 362 (4th Cir. 2013) (quoting* McElligott v. Foley, *182 F.3d 1248, 1255 (11th Cir. 1999)).* **This standard can be satisfied '"when the need for treatment is obvious'" yet prison officials merely provide 'medical care which is so cursory as to amount to no treatment at all***.'"* Id. *(quoting* McElligott, *182 F.3d at 1255).*

Sams v. Armor Corr. Health Servs., 2020 U.S. Dist. LEXIS 181799 at * 60 (E.D. Va. 2020) (emphasis added). Armed with explicit warnings that Ms. Shillingburg had a potentially life threatening condition, Defendant's offered nothing more than little sips of water, little bites of food some Mylanta, and failed to even communicate with a qualified provider regarding Ms. Shillingburg's condition. Such allegations of "medical care which is so cursory as to amount to no treatment at all" are sufficient to support a claim for deliberate indifference. Id.

It is certainly plausible for the Court to infer based on these facts that Defendants had *actual knowledge* of Ms. Shillingburg's serious medical needs and, nevertheless, were deliberately indifferent to those needs. However, the Fourth Circuit has made clear that actual subjective knowledge is not required in deliberate indifference claims involving pre-trial detainees. Accordingly, construing the allegations and drawing all reasonable inferences in favor of the Plaintiff, the Court should deny the present motion and find that Plaintiff has properly stated a plausible claim for deliberate indifference against the Defendants.

**2. Defendants' Plea for Sovereign Immunity Should be Denied.**

Like Defendant Walker, Defendants Caruso-Wilson, Henson, and Palmer also seek a determination that RSW is entitled to qualified immunity protection and that they, like Defendant Walker, should have that protection extended to them. In response, Plaintiff incorporates the arguments set forth in her Memorandum in Opposition to Defendant Walker's Partial Motion for Judgment.[1] See ECF No. 24 at 2-26.

**3. Defendants are Not Entitled to Qualified Immunity.**

    a. The Qualified Immunity Doctrine Should be Abandoned.

In a recent opinion from the Southern District of Mississippi, Judge Carlton Reeves meticulously outlines the growing judicial criticism of qualified immunity, a doctrine that he points out was "**invented** by the Supreme Court in 1967." See **Ex. A**, Green v. Thomas, 3:23-cv-00126-CWR-ASH, ECF No. 34 at 2 (S.D. Ms. 2024) (emphasis added). Judge Reeves, arguing that qualified immunity should be abandoned, writes that "[the plaintiff] joins lawyers, professors, judges and even Supreme Court Justices who have called for the doctrine's re-evaluation, if not its abolition." Id. Here, Plaintiff respectfully requests that this Court join this movement.

---

[1] In so doing, Plaintiff offers a few points of additional observation. First, these Defendants, like Defendant Walker, ask the Court to presume that they are employees of RSW despite the absence of any allegations regarding their status as employees. ECF No. 22 at 8. Contrary to this request, the information available at the time of this filing strongly suggests that the Defendants were just as likely to have been employees of an independent, private correctional contractor. Second, there are no allegations or facts upon which the Court can determine the Defendants' degree of permitted discretion or judgment as it relates to the allegations in the Complaint. Defendants, without explanation, conclude that they were entitled to "**decide** how to **manage** a prisoner's **medical care**." Id. at 8-9 (emphasis added). Yet neither LPNs nor CNAs are permitted to independently make such decisions under Virginia law. See e.g. 18VAC90-19-70 (requiring LPNs to perform their duties under the "direction or supervision" of a qualified provider); 18VAC90-19-280 (**prohibiting** the delegation of nursing tasks to CNAs "that require independent nursing judgment."). To that end, the Complaint alleges that the Defendants: evaluated and treated Ms. Shillingburg's serious symptoms without supervision and without consulting any provider (ECF No. 1 at ¶¶ 18-19); and that the Defendants **knew** they were not licensed to make unsupervised decisions about Ms. Shillingburg's medical care (ECF No. 1 at ¶ 41). Third, Plaintiff plausibly alleges that the Defendants were grossly negligent by operating outside the scope of their licensure, by exercising no care whatsoever in consulting Ms. Shillingburg's chart or even attempting to communicate with a provider, and by denying Ms. Shillingburg any access to medical care despite her obvious and serious medical condition – thus manifesting in indifference to her serious risk of harm. Id. at 18-19, 37-48, 53-56. Based on this, the Complaint alleges that each of the Defendants was "grossly negligent." Id. at 58.

Accordingly, Plaintiff incorporates and adopts Judge Reeves arguments and findings herein. In his opinion, Judge Reeves discusses the origins of 42 U.S.C. § 1983 (the "Ku Klux Klan Act") in 1871, and how the invention of the qualified immunity doctrine and its current application are counterproductive to the purposes of the Act. Id. at 9-18. In particular, he discusses how the modern application of the qualified immunity theory, and particularly the "clearly established" prong of the analysis, creates "thin distinctions [which] allow officers to evade accountability for excessive abuses, including killing people." Id. at 18. He further notes the disproportionate impact of qualified immunity on people of color. Id. at 18-20.

Judge Reeves embarks on a thorough challenge to the constitutionality of the qualified immunity doctrine, in which he cites numerous academic and judicial challenges to the same. Id. at 41-44. He writes:

> *Qualified immunity, however, does not appear in the text of the Ku Klux Klan Act. It is not found in any Constitutional provision or other statute. Nor does it "help give… life and substance" to the "specific guarantees in the Bill of Rights." Griswold v. Connecticut, 381 U.S. 479, 484 (1965) (citation omitted). The defense has the opposite effect.* ***It nullifies the guarantees of the Bill of Rights***.

Id. at 45 (emphasis added). Judge Reeves explains how the doctrine is "untethered to any authority;" how it has continued to evolve to make it harder and harder for individuals to sustain legitimate constitutional claims; that it deprives individuals of constitutional protections; and that its existence is so removed from the democratic process that it "merits the most stringent scrutiny." Id. at 45-47. Judge Reeves further discusses what is dubbed "the Counter-textual Problem," which demonstrates that a publication error in 1874 omitted language that prohibited common law defenses and may have led courts to apply the wrong version of the statute for the past 150 years. Id. at 47-48. He highlights that "[f]ederal judges have taken note" of this "game-changing argument." Id. at 48.

Judge Reeves then discusses the "dilemma" created by the recent <u>Dobbs</u> decision, which reversed decades of precedent in abortion rights cases based on the Supreme Court's determination that the line of controlling cases was based on a disregard of authority and the improper exercise of "raw judicial power." <u>Id.</u> at 49. Judge Reeves points out that, if the same reasoning is applied to qualified immunity, "the arguments against qualified immunity are stronger than the arguments Petitioners presented in <u>Dobbs</u>." <u>Id.</u> He then discusses how the espoused, theoretical justifications for qualified immunity do not translate in practice, and often have the opposite effect by "increase[ing] the costs and delays associated with constitutional litigation." <u>Id.</u> at 52-54. A comparison is then drawn to criminal cases, in which a defendant can be convicted even if the crime was not committed in the same way previously, stating "[y]ou can lose your liberty for new and creative kinds of criming." <u>Id.</u> at 55-56. He then discusses how the "particularized" application of the clearly established analysis turns the general principle that constitutional rights should not be violated "on its head." <u>Id.</u> at 56. He suggests that something has to give:

> *Consistency suggests that one of these two systems must change. If we value liberty as much as we say we do, perhaps the criminal law should refuse to convict someone unless the unlawfulness of their "particularized" conduct had already been held to be "beyond debate" at the time they acted.* <u>Id.</u> *Or, if it is qualified immunity to yield, we should define Constitutional rights at a higher level of generality, recognizing that we will never be able to "outline each of the many possible ways that a person might be said to" violate the Constitution.* <u>McCoy</u>*, 539 F.2d at 1058 n.8. But the two systems cannot coexist with any honesty.* ***It cannot be true that in America, it is easier to take away one's liberty than to hold the government accountable for violating the very Constitution guaranteeing that liberty.***

<u>Id.</u> (emphasis added). Plaintiff respectfully asks the Court to join in calling for the abandonment of qualified immunity so as to restore meaningful constitutional accountability for unlawful government actions.

      b. <u>Notwithstanding, Defendants Are Not Entitled to Qualified Immunity Protection.</u>

Nevertheless, here, the Complaint alleges a plausible violation of Ms. Shillingburg's Fourteenth Amendment rights that was clearly established at the time of the conduct in question.[2] Defendants' sole basis for claiming qualified immunity protection is that Plaintiff has failed to plead a cognizable claim under the Fourteenth Amendment for deliberate indifference to her serious medical needs. ECF No. 22 at 9. However, as discussed above, Plaintiff has stated a plausible claim against the Defendants for deliberate indifference to her serious medical needs. Further, as the Fourth Circuit recently pointed out, long before the circumstances giving rise to the present cause of action, it was "clearly established" that "[p]retrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs." Tarashuk v. Givens, 53 F.4th 154, 165 (4th Cir. 2022). Accordingly, the Defendants should be denied qualified immunity.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court find that Ms. Shillingburg has stated a plausible claim for deliberate indifference against the Defendants. Further, the Court should deny Defendants' plea for sovereign immunity because (i) RSW is not entitled to sovereign immunity, and (ii) the allegations do not support any inference that the Defendants should be extended any sovereign immunity afforded to RSW. Finally, because the Plaintiff has stated a plausible claim for deliberate indifference that was clearly established at the time of the underlying factual circumstances, the Court should deny the Defendants' request for qualified immunity protection.

---

[2] It is noted that Defendants' do not suggest that these rights were not clearly established, but that reality is addressed here for completeness.

Respectfully Submitted,

TAMMY YANEZ, Administrator of the
Estate of Brittney Shillingburg,

/s/
Seth R. Carroll (VSB No. 74745)
Commonwealth Law Group, LLC
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 999-9999
Facsimile: (866) 238-6415
scarroll@hurtinva.com