CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
October 31, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| Tammy Yanez, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 5:24-cv-00025 |
| Christine Walker, *et al.*, | ) ) ) |
| Defendants. | ) ) |

## **MEMORANDUM OPINION**

This matter is before the court on Defendant Christine Walker's motion for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Dkt. 18.) Walker filed the motion at issue after filing an answer to Plaintiff Tammy Yanez's complaint (Dkt. 1) on September 4, 2024. (Dkt. 17.) The motion is fully briefed and is ripe for review. For the reasons stated below, the court will deny Walker's motion as premature.

### I.     Background

This case arises out of the death of Brittney Shillingburg while she was incarcerated at the Rappahannock-Shenandoah-Warren County Regional Jail ("RSW"). (Compl. ¶ 4 (Dkt. 1).) Plaintiff Tammy Yanez, as administrator of Shillingburg's estate, brought this action against Defendants Christine Walker, LPN, Crystal Caruso-Wilson, LPN, Sara Henson, LPN, and Allison Palmer, CNA, all medical staff working at RSW at the time of Shillingburg's death. (*Id.* at 1.) Yanez raises a 42 U.S.C. § 1983 claim against all four defendants for violation of the Fourteenth Amendment (*id.* ¶¶ 34–50) as well as state-law claims for medical malpractice and

wrongful death (*id.* ¶¶ 51–61). The facts are taken from Yanez's complaint and, at this stage, are presumed to be true. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

On October 18, 2022, Shillingburg was admitted to RSW. (Compl. ¶ 7.) Shillingburg had been previously diagnosed with Congenital Adrenal Hyperplasia, a genetic disorder which results in adrenal insufficiency. (*Id.* ¶¶ 5, 8.) The disorder requires continuous glucocorticoid replacement therapy, often offered in the form of hydrocortisone. (*Id.* ¶ 6.) Failure to provide this medication can result in adrenal crisis and eventually death. (*Id.* ¶¶ 5, 32.)

RSW was aware of Shillingburg's condition from a prior incarceration at that facility and performed a health screening upon her intake on October 18. (*Id.* ¶¶ 7–8.) Shillingburg arrived at the facility with 42 tabs of hydrocortisone in her possession. (*Id.* ¶ 9.) Despite this, RSW did not offer Shillingburg any hydrocortisone from the date of her admission through the morning of October 21, 2022. (*Id.*) When RSW did offer the medication, it offered it "floated," or crushed into a powder and suspended on the surface of a liquid. (*Id.* ¶ 10 & n.1.) Staff at RSW claimed that it was "jail policy" to offer medication in this form. (*Id.* ¶ 10.) Because Shillingburg refused to take her medication floated, she did not take her medication until the evening of October 25, 2022. (*Id.*)

During this time, Shillingburg's family became aware that she was not taking her medication due to the jail's policy of floating. (*Id.* ¶ 11.) They informed her doctor, who called RSW on the morning of October 25 to voice his concern that Shillingburg was not taking her medication. (*Id.*) Specifically, her doctor noted that "he was concerned about her living, as this med [wa]s a life sustaining med." (*Id.*) Walker answered and documented the call,

including a request from Shillingburg's doctor to speak with one of the doctors at RSW. (*Id.*) Walker informed Shillingburg's doctor that it was jail policy to float medication. (*Id.*) That evening, Walker attempted to administer Shillingburg's medication again. (*Id.* ¶ 13.) Shillingburg refused, presumably because the medication was again floated, but agreed to take her medication in that form if the water was poured onto the crushed medication "right before taking" rather than leaving the medication "sitting in water for a long period of time." (*Id.*)

Shillingburg's doctor called RSW again on October 26, 2022. (*Id.* ¶ 14.) He directed that the hydrocortisone should not be floated when administered to Shillingburg. (*Id.*) Following this conversation, RSW's Director of Nursing, Superintendent, and Assistant Superintendent agreed to no longer float Shillingburg's medication. (*Id.* ¶¶ 14–15.) Shillingburg later began to receive her hydrocortisone in pill form. (*Id.* ¶ 16.)

Shillingburg also began experiencing symptoms of adrenal crisis that day. (*Id.* ¶¶ 17–18.) Even "[d]uring acute illness," adrenal crisis may be reversed by "simply increasing [the patient's] medication by 2 or 3 times her normal dose." (*Id.* ¶ 30.) If the patient is "unable to ingest the medications or if the increased dosage did not alleviate her symptoms," transfer to a hospital for intravenous fluid and glucocorticoid administration is the next step of care. (*Id.* ¶¶ 30–31.) Untreated, adrenal crisis may result in death. (*Id.* ¶ 32.)

Throughout the day on October 26, Shillingburg reported to Henson and Caruso-Wilson symptoms consistent with adrenal crisis: She had no appetite, could not eat, felt light-headed and dizzy, and felt nauseated. (*Id.* ¶ 18.) Shillingburg was informed that she would be taken to see a doctor the next day. (*Id.*) She was not. (*Id.* ¶ 19.) Nor is there any indication

that Shillingburg's condition was communicated to a medical doctor or other provider. (*Id.*) On October 27, Shillingburg interacted with Caruso-Wilson, Palmer, and Katharine Castillo, LPN, and informed them that she was unable to eat or drink, was exhausted, and was having difficulty standing upright. (*Id.*) The three staff members instructed Shillingburg to "try small sips" of water and take "small bites of food" but did not inform a doctor or other medical provider. (*Id.*) They also offered her "Mylanta to see if that would help." (*Id.*)

On October 28, 2022, Walker was called to intake to examine Shillingburg for complaints of chest pain. (*Id.* ¶ 20.) Walker's notes indicate that upon arrival, Shillingburg was "laying down and did not appear to be in any distress." (*Id.*) Shillingburg did, however, report that she was "freezing," had low energy, felt nauseated, and was having difficulty breathing. (*Id.*) Walker was unable to obtain Shillingburg's vital signs during the visit. (*Id.*) She did not inform any medical doctor or other provider of Shillingburg's condition. (*Id.* ¶ 21.)

Video footage of Shillingburg's cell after this encounter shows Shillingburg "in significant distress and physical deterioration throughout the remainder of the day." (*Id.* ¶ 22.) When a guard entered Shillingburg's cell at 2:56 p.m. to offer her a cup of water, Shillingburg was unable to stand. (*Id.* ¶ 23.) Two minutes later, "Shillingburg rolled over on her back, and appeared to go limp." (*Id.*) Shillingburg did not move from 3:02 p.m. to 3:38 p.m., when guards re-entered her cell to check on her. (*Id.*) At that time, RSW staff began chest compressions. (*Id.* ¶ 24.) They continued until emergency medical services arrived and transported Shillingburg to Winchester Medical Hospital. (*Id.*) There, Shillingburg "went into

cardiac arrest for another 30 minutes," after which she was transferred to the Winchester Medical Center ICU. (*Id.* ¶ 25.)

Shillingburg remained in the ICU on "significant amounts of vasopressor support" until October 29, 2022, when her mother and brothers decided to transition her to comfort care. (*Id.* ¶ 26.) Shillingburg died a short time later. (*Id.*) The autopsy report listed Shillingburg's cause of death as "complications of congenital adrenal hyperplasia." (*Id.* ¶ 27.)

On May 7, 2024, Yanez, as administrator of Shillingburg's estate, filed a complaint against Defendants Caruso-Wilson, Henson, Palmer, and Walker in the Harrisonburg Division of the Western District of Virginia. (Dkt. 1.) In July, Chief District Judge Elizabeth K. Dillon granted Yanez's motion for leave to serve subpoena duces tecum and allowed her until October 5, 2024, to effect service on defendants. (Dkt. 7.) Following service on all defendants in mid-August, (Dkts. 10–13), Walker filed two documents on September 4, 2024. The first was an answer to Yanez's complaint. (Dkt. 17.) The second was the motion for partial judgment on the pleadings at issue here. (Dkt. 18.) The motion seeks partial judgment on the pleadings on the basis that Yanez's state law claims—her survival claim for personal injuries[1] and her claim for simple negligence—are barred by the statute of limitations and sovereign immunity, respectively. (*See* Def.'s Mem. in Supp. at 1 (Dkt. 19).)

---

[1] In the briefing on this motion, parties disagree about whether Yanez pled a state-law survival claim for personal injuries or a state-law wrongful death claim. (*See* Pl.'s Opp'n Mem. at 2 (Dkt. 24); Def.'s Reply at 5 (Dkt. 27) (requesting this court "enter an order either holding that such [survival] claim is time barred or holding that the complaint does not contain a survival claim").) Because the court does not reach the merits of Yanez's complaint on this motion, it declines to address the issue here.

Also on September 4, 2024, Walker's co-defendants Caruso-Wilson, Henson, and Palmer filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 21.) To date, they have not filed an answer to Yanez's complaint. Yanez filed a response to Walker's motion for partial judgment on the pleadings on September 18, 2024. (Dkt. 24.) Walker filed her reply six days later. (Dkt. 27.) The motion is before the court fully briefed and ripe for review.

## II. Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed— but early enough not to delay trial—a party may move for judgment on the pleadings." A court properly grants a motion for judgment on the pleadings "if 'it appears certain that the plaintiff cannot prove any set of facts in support of [her] claim entitling [her] to relief.'" *Pulte Home Corp. v. Montgomery Cnty., Md.*, 909 F.3d 685, 691 (4th Cir. 2018) (quoting *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014)). In making this determination, the court employs the same standard of review that applies under Rule 12(b)(6). *Mejico v. Alba Web Designs, LLC*, 515 F. Supp. 3d 424, 429 (W.D. Va. 2021) (citing *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014)).

## III. Analysis

For the purposes of Rule 12(c), the pleadings are not closed until all defendants have filed answers to a plaintiff's complaint. *See Scottsdale Ins. Co. v. Doe*, No. 7:13-cv-00342, 2014 WL 3778510, at *3 (W.D. Va. July 30, 2014) (finding the pleadings not yet closed because one of five defendants had not filed an answer to plaintiff's complaint); *see also Haughie v. Wexford*

*Health Sources, Inc.*, Civ. No. ELH-18-3963, 2020 WL 1158568, at *4 (D. Md. Mar. 9, 2020) ("Numerous cases indicate that a Rule 12(c) motion is premature if filed before all defendants have answered the suit."); *Dunn-Mason v. JP Morgan Chase Bank Nat'l Ass'n*, No. 11-cv-13419, 2013 WL 4084676, at *4 (E.D. Mich. Aug. 13, 2013) ("[P]leadings are not 'closed' until every defendant has filed an answer."). A motion to dismiss does not constitute an answer that will close the pleadings. *See Dunn-Mason*, 2013 WL 4084676, at *4 (explaining that because one defendant filed a motion to dismiss and not an answer, "not all defendants have answered the complaint and the pleadings in this matter are not 'closed' for purposes of Rule 12(c)"). Rather, "the pleadings are not considered closed until the parties have filed a complaint, an answer, and in some cases, a reply." *Mizell v. Sara Lee Corp.*, No. 2:05CV129, 2005 WL 1668056, at *2 (E.D. Va. June 9, 2005); *see* Fed. R. Civ. P. 7(a).

Filing a motion for judgment on the pleadings before the pleadings are closed renders the motion premature. The appropriate disposition of a premature motion is denial. *See Doe v. United States*, 419 F.3d 1058, 1061 (9th Cir. 2005) (denying as premature motion for judgment on the pleadings filed before defendant filed an answer).

Applying this standard, Walker's motion for partial judgment on the pleadings is premature. Walker filed the motion at issue on September 4, 2024, immediately after filing an answer to Yanez's complaint. (*See* Dkts. 17, 18.) At the time, Walker was the only defendant to have filed an answer. She remains the only defendant to do so. Her co-defendants' motion to dismiss (Dkt. 21) does not suffice to close the pleadings. *See Habeeba's Dance of the Arts, Ltd. v. Knoblauch*, No. 2:05-CV-926, 2006 WL 968642, at *2 (S.D. Ohio Apr. 10, 2006) ("[T]he

pleadings are not closed until all defendants have filed an answer, even when one defendant has filed a motion to dismiss instead of answering.").

Because the pleadings are not closed, Rule 12(c) does not provide an avenue for the court to reach the merits of Walker's motion for partial judgment on the pleadings. Walker has not argued, and the court does not find, any reason why it should exercise its discretion to consider the motion despite this default. *See Dunn-Mason*, 2013 WL 4084676, at *4 (recognizing such reasons where one defendant had not yet been served and where defendants had not answered the complaint for five years). Accordingly, the court will deny Walker's motion for partial judgment on the pleadings as premature.

### IV. Conclusion

For the foregoing reasons, Walker's motion for partial judgment on the pleadings (Dkt. 18) will be denied.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 31st day of October, 2024.

/s/ *Jasmine H. Yoon*
_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE