CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

December 20, 2024

LAURA A. AUSTIN, CLERK
BY:  s/K. Lokey
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Tammy Yanez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-cv-00025 |
| | ) | |
| Christine Walker *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court on Defendants Crystal Caruso-Wilson, Sara Henson, and Allison Palmer's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 21.) The motion is fully briefed and is ripe for review. For the reasons stated below, the court will deny Defendants' motion.

### I.    Background

This case arises out of the death of Brittney Shillingburg while she was incarcerated at the Rappahannock-Shenandoah-Warren County Regional Jail ("RSW"). (Compl. ¶ 4 (Dkt. 1).) Plaintiff Tammy Yanez, as administrator of Shillingburg's estate, brought this action against Defendants Christine Walker, LPN, Crystal Caruso-Wilson, LPN, Sara Henson, LPN, and Allison Palmer, CNA, all medical staff working at RSW at the time of Shillingburg's death. (*Id.* at 1.) Yanez raises a 42 U.S.C. § 1983 claim against all four Defendants for violation of

the Fourteenth Amendment, (*id.* ¶¶ 34–50), as well as a state-law claim for medical negligence brought under a wrongful death right of action, (*id.* ¶¶ 51–61). The facts are taken from Yanez's complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

On October 18, 2022, Shillingburg was admitted to RSW as a pretrial detainee. (Compl. ¶¶ 7, 35.) Shillingburg had been previously diagnosed with Congenital Adrenal Hyperplasia ("CAH"), a genetic disorder which results in adrenal insufficiency. (*Id.* ¶¶ 5, 8.) The disorder requires continuous glucocorticoid replacement therapy, often offered in the form of hydrocortisone. (*Id.* ¶ 6.) Failure to provide this medication can result in adrenal crisis and eventually death. (*Id.* ¶¶ 5, 32.)

RSW had documented Shillingburg's condition during a prior incarceration at that facility and performed a health screening upon her intake on October 18. (*Id.* ¶¶ 7–8.) Shillingburg arrived at the facility with 42 tabs of hydrocortisone in her possession. (*Id.* ¶ 9.) Despite this, RSW did not offer Shillingburg any hydrocortisone from the date of her admission through the morning of October 21, 2022. (*Id.*) When RSW did offer the medication, it offered it "floated," or crushed into a powder and suspended on the surface of a liquid. (*Id.* ¶ 10 & n.1.) Staff at RSW claimed that it was "jail policy" to offer medication in this form. (*Id.* ¶ 10.) Because Shillingburg refused to take her medication floated, she did not take her medication until the evening of October 25, 2022. (*Id.*)

During this time, Shillingburg's family became aware that she was not taking her medication due to the jail's policy of floating. (*Id.* ¶ 11.) They informed her doctor, who called

RSW on the morning of October 25 to voice his concern that Shillingburg was not taking her medication. (*Id.*) Specifically, her doctor noted that "he was concerned about her living, as this med [wa]s a life sustaining med." (*Id.*) Walker answered and documented the call, including a request from Shillingburg's doctor to speak with one of the doctors at RSW. (*Id.*) Walker informed Shillingburg's doctor that it was jail policy to float medication. (*Id.*) That evening, Walker attempted to administer Shillingburg's medication again. (*Id.* ¶ 13.) Shillingburg refused, presumably because the medication was again floated, but agreed to take her medication in that form if the water was poured onto the crushed medication "right before taking" rather than leaving the medication "sitting in water for a long period of time." (*Id.*)

Shillingburg's doctor called RSW again on October 26, 2022. (*Id.* ¶ 14.) He directed that the hydrocortisone should not be floated when administered to Shillingburg. (*Id.*) Following this conversation, RSW's Director of Nursing, Superintendent, and Assistant Superintendent agreed to no longer float Shillingburg's medication. (*Id.* ¶¶ 14–15.) The Director of Nursing informed the nursing staff of this change. (*Id.* ¶ 15.) Shillingburg later began to receive her hydrocortisone in pill form. (*Id.* ¶ 16.)

Shillingburg also began experiencing symptoms of adrenal crisis that day. (*Id.* ¶¶ 17–18.) Even "[d]uring acute illness," adrenal crisis may be reversed by "simply increasing [the patient's] medication by 2 or 3 times her normal dose." (*Id.* ¶ 30.) If the patient is "unable to ingest the medications or if the increased dosage did not alleviate her symptoms," transfer to a hospital for intravenous fluid and glucocorticoid administration is the next step of care. (*Id.* ¶¶ 30–31.) Untreated, adrenal crisis may result in death. (*Id.* ¶ 32.)

Throughout the day on October 26, Shillingburg reported to Henson and Caruso-Wilson symptoms consistent with adrenal crisis: She had no appetite, could not eat, felt light-headed and dizzy, and felt nauseated. (*Id.* ¶ 18.) Shillingburg was informed that she would be taken to see a doctor the next day. (*Id.*) She was not. (*Id.* ¶ 19.) Nor is there any indication that Shillingburg's condition was communicated to a medical doctor or other provider. (*Id.*) On October 27, Shillingburg interacted with Caruso-Wilson, Palmer, and Katharine Castillo, LPN, and informed them that she was unable to eat or drink, was exhausted, and was having difficulty standing upright. (*Id.*) The three staff members instructed Shillingburg to "try small sips" of water and take "small bites of food" but did not inform a doctor or other medical provider. (*Id.*) They also offered her "Mylanta to see if that would help." (*Id.*)

On October 28, 2022, Walker was called to intake to examine Shillingburg for complaints of chest pain. (*Id.* ¶ 20.) Walker's notes indicate that upon arrival, Shillingburg was "laying down and did not appear to be in any distress." (*Id.*) Shillingburg did, however, report that she was "freezing," had low energy, felt nauseated, and was having difficulty breathing. (*Id.*) Walker was unable to obtain Shillingburg's vital signs during the visit. (*Id.*) She did not inform any medical doctor or other provider of Shillingburg's condition. (*Id.* ¶ 21.)

Video footage of Shillingburg's cell after this encounter shows Shillingburg "in significant distress and physical deterioration throughout the remainder of the day." (*Id.* ¶ 22.) When a guard entered Shillingburg's cell at 2:56 p.m. to offer her a cup of water, Shillingburg was unable to stand. (*Id.* ¶ 23.) Two minutes later, "Shillingburg rolled over on her back, and appeared to go limp." (*Id.*) Shillingburg did not move from 3:02 p.m. to 3:38 p.m., when

- 4 -

guards re-entered her cell to check on her.  (*Id.*)  At that time, RSW staff began chest compressions.  (*Id.* ¶ 24.)  They continued until emergency medical services arrived and transported Shillingburg to Winchester Medical Hospital.  (*Id.*)  There, Shillingburg "went into cardiac arrest for another 30 minutes," after which she was transferred to the Winchester Medical Center ICU.  (*Id.* ¶ 25.)

Shillingburg remained in the ICU on "significant amounts of vasopressor support" until October 29, 2022, when her mother and brothers decided to transition her to comfort care.  (*Id.* ¶ 26.)  Shillingburg died a short time later.  (*Id.*)  The autopsy report listed Shillingburg's cause of death as "complications of congenital adrenal hyperplasia."  (*Id.* ¶ 27.)

On May 7, 2024, Yanez, as administrator of the estate of Shillingburg, filed a complaint against Defendants Caruso-Wilson, Henson, Palmer, and Walker in the Harrisonburg Division of the Western District of Virginia.  (Compl.)  The complaint seeks "an amount in excess of" one million dollars for compensatory damages, along with associated costs, pre-judgment and post-judgment interest, and attorneys' fees.  (*Id.* ¶ 61.)  The complaint also demands punitive damages and "such other relief as is lawful, just and proper."  (*Id.*)

In July, Chief District Judge Elizabeth K. Dillon granted Yanez's motion for leave to serve subpoena duces tecum and allowed her until October 5, 2024, to effect service on Defendants.  (Dkt. 7.)  Following service on all Defendants in mid-August, (Dkts. 10–13), Caruso-Wilson, Henson, and Palmer filed a motion to dismiss on September 4, 2024.  (Dkt. 21.)  The motion seeks to dismiss Yanez's claims for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  (*See* Defs.' Mem. in Supp. of Mot. to

Dismiss Pl.'s Compl. at 4–10 (Dkt. 22) [hereinafter "Defs.' Mem."].)  Yanez filed a response

to Defendants' motion to dismiss on September 18, 2024.  (Dkt. 25.)  Defendants filed a reply

six days later.  (Dkt. 26.)  The motion is before the court fully briefed and ripe for review.

## II.     Standard of Review

Challenges to subject matter jurisdiction brought under Federal Rule of Civil Procedure

12(b)(1) may take one of two forms: (1) a facial challenge, which asserts the "complaint simply

fails to allege facts upon which subject matter jurisdiction can be based"; or (2) a factual

challenge, which asserts "that the jurisdictional allegations of the complaint [are] not true."

*Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams*, 697 F.2d at 1219).

When a defendant raises a facial challenge to subject matter jurisdiction, "the facts alleged in

the complaint are taken as true, and the motion must be denied if the complaint alleges

sufficient facts to invoke subject matter jurisdiction."  *Id.*

Motions to dismiss for failure to state a claim brought under Rule 12(b)(6) test the legal

sufficiency of a complaint.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  They

do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses."  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*,

825 F.3d 206, 214 (4th Cir. 2016)).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff

must plead sufficient factual allegations to "state a claim to relief that is plausible on its face."

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

plausible on its face "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

### III.    Analysis

In their motion to dismiss, Defendants argue that the court should dismiss Yanez's complaint because it fails to state a claim upon which relief can be granted.  Defendants further argue that the court should dismiss Yanez's complaint because Defendants are entitled to raise qualified and sovereign immunity defenses, raising a facial challenge to the court's jurisdiction.[1] The court accordingly will treat all factual allegations in the complaint as true.  *See Kerns*, 585 F.3d at 192; *Iqbal*, 556 U.S. at 678.

### A.  Count One: Fourteenth Amendment

#### 1.  *Failure to State a Claim*

Defendants first argue that Yanez fails to plead a violation of the Fourteenth Amendment for which she may bring a claim under 42 U.S.C. § 1983.  At the outset, the court finds that Yanez appropriately invokes the Fourteenth rather than the Eighth Amendment.

Yanez's complaint alleges that "[a]t the time of the events detailed in th[e] Complaint, Ms. Shillingburg was a pre-trial detainee."  (Compl. ¶ 35.)  Defendants dispute Shillingburg's status as a pretrial detainee, claiming she was convicted on October 28, 2022, and that therefore the Eighth Amendment standard should apply.  (Defs.' Mem. at 6 n.3; Defs.' Reply to Pl.'s Opp'n to Mot. to Dismiss Pl.'s Compl. ¶ 11 (Dkt. 26) [hereinafter "Defs.' Reply"].)  In

---

[1] Where a party's motion does not specify the theory under which it challenges subject matter jurisdiction, the court may draw a reasonable inference.  *See Sierra Club v. Kempthorne*, 589 F. Supp. 2d 720, 725 (W.D. Va. 2008) (treating motion as a facial challenge where "it appear[ed] evident" it was so); *Magnate, LLC v. U.S. Env't Prot. Agency*, 678 F. Supp. 3d 767, 772–73 (W.D. Va. 2023) (construing motion as facial challenge where moving party did not specify and the briefing and attached declaration did not "necessarily challenge[] the truth of [plaintiff's] *well-pleaded, non-conclusory* allegations").

support, Defendants attach to their reply brief a docket from Shenandoah General District Court showing that a "Review Progress" hearing was "Finalized" the morning of October 28, 2022. (*See* Defs.' Reply Ex. B (Dkt. 26-2).)

On a motion to dismiss, the court's evaluation is generally limited to the allegations of the complaint itself. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); Fed. R. Civ. P. 12(d). Though the court may consider some limited additional documents without converting the motion to one for summary judgment, *see Goines*, 822 F.3d at 166, the court declines to do so here. Because Caruso-Wilson, Henson, and Palmer's contested actions all took place prior to the purported date of conviction, (Compl. ¶¶ 18–19), analysis under the Fourteenth Amendment standard for pretrial detainees remains appropriate regardless of the court's disposition on the proffered exhibit.

The Fourteenth Amendment's Due Process Clause guarantees a pretrial detainee "adequate medical care and freedom from deliberate indifference to his serious medical needs." *Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022). It is true that, to the extent Yanez alleges "mere negligence, mistake or difference of opinion," she does not plead a constitutional harm. *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *see Short v. Hartman*, 87 F.4th 593, 611–12 (4th Cir. 2023) (reaffirming this principle). But neither does she need to plead "the heightened, subjective Eighth Amendment deliberate indifference standard." *Short*, 87 F.4th at 609 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015)). "For a Fourteenth Amendment claim, it is enough that the challenged action is not rationally related to a legitimate nonpunitive purpose or is excessive in relation to that purpose." *Id.*

- 8 -

In *Short v. Hartman*, the Fourth Circuit clarified that a pretrial detainee must plead four elements to raise a claim for deliberate indifference to medical needs:

> (1) [the detainee] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id.* at 611. The court emphasized that "[t]he plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id.*; *see, e.g.*, *Jenkins v. Woodard*, 109 F.4th 242, 249 n.3 (4th Cir. 2024) ("Accordingly, Sheriff Woodard's subjective knowledge is irrelevant to this case."). Instead, "it is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Short*, 87 F.4th at 611 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

As to the first element, a medical condition is "serious if it is diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 612 (cleaned up) (discussing the objective element of the Eighth Amendment deliberate indifference test); *see Hensley v. Wellpath, LLC*, No. 4:24-cv-00014, 2024 WL 3671298, at *4 (W.D. Va. Aug. 6, 2024) (applying to Fourteenth Amendment analysis). Yanez satisfies this element by alleging that a doctor treated Shillingburg's CAH

outside of RSW and that Shillingburg would suffer serious, possibly fatal, harm if she did not receive the medication that treated her condition.  (Compl. ¶¶ 5, 11, 32.)

Yanez's allegations also satisfy the second element.  Yanez pleads that each individual Defendant, despite knowing of Shillingburg's condition, at a minimum recklessly failed to provide Shillingburg with appropriate medical care to address her adrenal crisis.[2]  (*Id.* ¶¶ 18–19.)  Though Caruso-Wilson, Henson, and Palmer purportedly offered Shillingburg fluids and Mylanta to ease her symptoms, Yanez alleges that none of them took any action to address Shillingburg's underlying medical condition, despite knowing of her CAH.  (*Id.* ¶¶ 18–19, 46–47.)  Specifically, Defendants "refus[ed] to administer Ms. Shillingburg's medication via alternative methods, refus[ed] to consult with any specialist, refus[ed] to send Ms. Shillingburg offsite for any evaluation or treatment, and refus[ed] to send Ms. Shillingburg to the hospital even after she asked for outside medical care."  (*Id.* ¶ 48.)  Additionally, Yanez alleges that "no medical doctor or other provider was informed or consulted" about Shillingburg's symptoms.  (*Id.* ¶ 19; *see id.* ¶¶ 18, 40, 43.)

---

[2] At various points, Defendants cite Shillingburg's refusal to take her medication floated as evidence that Yanez alleges only a disagreement with the course of treatment and not deliberate indifference.  (*See* Defs.' Mem. at 5; Defs.' Reply ¶ 2.)  To the extent Yanez alleges Defendants were deliberately indifferent in administering Shillingburg's hydrocortisone floated, the court agrees with Defendants that Yanez fails to allege a Fourteenth Amendment violation.  But to the extent Yanez alleges Defendants were deliberately indifferent in failing to appropriately treat Shillingburg's resultant adrenal crisis, Shillingburg's refusal to take her medication has no bearing on the deliberate indifference analysis.  To the extent that Defendants argue they are absolved of liability because the adrenal crisis Shillingburg experienced was a result of her own refusal of medication, they miss the point.  Detainees who attempt suicide, for example, are still entitled to medical care, even if their medical crisis is a result of their own actions.  *See, e.g.*, *Short*, 87 F.4th at 612–15 (applying deliberate indifference analysis to suicide risk).

Defendants attempt to refute this last allegation by attaching to their reply brief a portion of Shillingburg's medical record, which they claim demonstrates "Shillingburg did see a medical provider on October 27, 2022, while plaintiff alleges Shillingburg was in adrenal crisis." (Defs.' Reply ¶ 8; *see* Def.'s Reply Ex. A (Dkt. 31).) Though the court's review on a motion to dismiss is typically limited to the allegations of the complaint itself, the court may also consider documents submitted by the movant which are undisputedly authentic and "integral to the complaint." *Goines*, 822 F.3d at 166.

A document is integral when it "by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Smith v. Jennings*, No. 7:22-cv-00588, 2023 WL 3959927, at *10 (W.D. Va. June 12, 2023) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)); *see, e.g.*, *Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 645 (4th Cir. 2018) (finding document showing permit coverage "clearly integral" when the complaint was "based solely on [the defendant's] alleged lack of [permit] coverage"). Because Yanez's claims arise not from the existence of Shillingburg's medical record itself, but from the alleged action or inaction of medical professionals that may be documented in that record, the court finds the attached exhibit is not integral to Yanez's complaint. The court therefore will not consider the portion of the medical record offered by Defendants in resolving this motion to dismiss.

To the third element, Yanez's complaint alleges that Caruso-Wilson, Henson, and Palmer each knew or should have known that Shillingburg suffered from CAH. (Compl. ¶ 38.) In support of this allegation, Yanez claims that each Defendant "had access to Ms.

Shillingburg's [medical] chart, where information was readily available regarding her CAH diagnosis and her need for administration of hydrocortisone." (*See id.* ¶ 39.) Indeed, all three Defendants had medical interactions with Shillingburg on October 26 or 27, 2022—at least two of which were recorded in that same chart. (*Id.* ¶¶ 18–19.) Shillingburg's medical record reflected a call from her doctor emphasizing the importance of her daily medication and the potentially fatal consequences of forgoing it, (*id.* ¶ 11), as well as a note from another nurse indicating she spoke to the patient "about the importance of taking her meds," (*id.* ¶ 13). It also reflected medical information from a previous incarceration at RSW, which indicated the patient "has adrenal insufficiency and [is] supposed to be on hydrocortisone 20mg in AM and 10 mg in PM." (*Id.* ¶ 8.) Finally, Shillingburg entered RSW in possession of 42 tabs of hydrocortisone, the medication required to treat her CAH. (*Id.* ¶ 9.)

Together, these factual allegations are more than sufficient to support a claim that Caruso-Wilson, Henson, and Palmer knew or should have known of Shillingburg's serious medical condition. Although Yanez does not explicitly allege that any of the three Defendants actually read the entries documenting Shillingburg's CAH, Shillingburg was a pretrial detainee, so it is not necessary to allege subjective knowledge for Yanez's Fourteenth Amendment claim to survive. *See Short*, 87 F.4th at 611 ("That showing remains sufficient, but it is no longer necessary.").

Yanez's complaint further alleges that Caruso-Wilson, Henson, and Palmer knew or should have known that their inaction posed an unjustifiably high risk of harm to Shillingburg. All three Defendants had access to Shillingburg's medical chart, where Dr. Culver's concerns

about Shillingburg's failure to take her medication and the risks thereof were clearly documented. (Compl. ¶¶ 11, 39.) Yanez claims the three Defendants were subjectively aware that Shillingburg's refusal to take her medication "significantly increased" the risk that she would experience a serious medical emergency. (*Id.* ¶ 45.) The complaint further alleges "Defendants also knew how serious Ms. Shillingburg's symptoms were and knew that the minimal treatment she was receiving" at their hands "was largely ineffective" as to the underlying condition of CAH. (*Id.* ¶ 46.) For the same reasons stated above, the court finds that Yanez has adequately alleged that Defendants knew their actions or inaction posed an unjustifiably high risk of harm to Shillingburg.

Lastly, the complaint fulfills the fourth element because it alleges that Caruso-Wilson, Henson, and Palmer's inaction denied Shillingburg "timely, adequate, and compassionate medical care" and resulted in Shillingburg's death. (*Id.* ¶ 49.) The court therefore finds that Yanez sufficiently alleges all four elements of a Fourteenth Amendment deliberate indifference claim such that the court may draw the reasonable inference that each Defendant "failed to act 'in the face of an unjustifiably high risk of harm that [was] either known or so obvious that it should [have been] known.'" *Short*, 87 F.4th at 611 (quoting *Farmer*, 511 U.S. at 836). Accordingly, Yanez's deliberate indifference claim survives 12(b)(6) review.

### 2. *Qualified Immunity*

Defendants argue that even if Yanez's complaint sufficiently states a constitutional claim, they are nonetheless entitled to protection under qualified immunity. (Defs.' Mem. at 9–10.) Qualified immunity "protects government officials 'from liability for civil damages

- 13 -

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Though a defendant may raise the qualified immunity defense at the motion to dismiss stage of litigation, "[o]rdinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). Where the determination of whether the right at issue was clearly established "requires a more developed record," the court may appropriately defer consideration of the defense to allow for further factual development. *See Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 459–60 (W.D. Va. 2021); *Davis v. Keller*, No. 7:23-cv-00593, 2024 WL 4326544, at *7 (W.D. Va. Sept. 27, 2024) ("Finally, to the extent there is any lingering question of whether Defendants violated a clearly established constitutional right, the court finds that question is premature at this stage, and instead reserves consideration of that question for summary judgment.").

The court ultimately reserves consideration of the qualified immunity defense for the summary judgment stage. Accordingly, the court denies Defendants' motion to dismiss as to Yanez's constitutional claim.

### B. Count Two: Wrongful Death

Yanez's complaint also raises a state-law claim for medical negligence brought pursuant to a wrongful death right of action under Va. Code § 8.01-50. (Compl. ¶¶ 51–61.) The parties do not dispute that Yanez has sufficiently raised this claim. Instead, Defendants argue that Yanez's claims are barred by sovereign immunity. (Defs.' Mem. at 7–9; Defs.' Reply ¶ 16.)

Because "sovereign immunity is akin to an affirmative defense," Defendants bear the burden of demonstrating that sovereign immunity exists. *Hutto v. S.C. Retirement Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). The court must first determine whether RSW is entitled to sovereign immunity before it can determine whether that immunity extends to the individual Defendants.

      1. <u>Sovereign Immunity as to RSW</u>

"The doctrine of sovereign immunity is 'alive and well' in Virginia." *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 876 S.E.2d 917, 922 (Va. 2022) (quoting *Messina v. Burden*, 321 S.E.2d 657, 660 (Va. 1984)). But "whether a regional jail authority is entitled to sovereign immunity is an unsettled question" that has not been addressed by the Fourth Circuit or the Supreme Court of Virginia. *Haleem v. Quinones*, No. 5:17-cv-00003, 2017 WL 4400767, at *2 (W.D. Va. Sept. 30, 2017). Until recently, "[m]ost federal district courts in Virginia and at least one Virginia circuit court that ha[d] addressed the issue ha[d] concluded that regional jail authorities are not entitled to sovereign immunity." *Id.* Indeed, this appears to be the "growing consensus" in the Eastern District of Virginia. *Funkhouser v. Brown*, No. 5:22-cv-056, 2024 WL 3572311, at *8 (W.D. Va. July 29, 2024) (collecting cases). But within the last few years, a majority of judges in the Western District of Virginia have concluded the opposite. *See Davis v. Lilly*, No. 7:23-cv-152, 2023 WL 6565288, at *9 (W.D. Va. Oct. 10, 2023) (Ballou, J.) (finding regional jail authority entitled to sovereign immunity); *Donovan v. Buchanan Cnty. Sheriff's Off.*, No. 1:21-cv-00005, 2022 WL 1580108, at *8 (W.D. Va. May 19, 2022) (Jones, J.)

(same); *Tilson v. Humphrey*, No. 5:19-cv-033, 2019 WL 6902677, at *7 (W.D. Va. Dec. 18, 2019)

(Urbanski, J.) (same); *Haleem*, 2017 WL 4400767, at *3 (Dillon, J.) (same).

"Despite these conflicting conclusions, courts 'agree that the outcome turns on

whether a regional jail authority operates as a municipal corporation'—the framework for

which is well-established." *Funkhouser*, 2024 WL 3572311, at *8 (quoting *Davis*, 2023 WL

6565288, at *9). In *Hampton Roads Sanitation District Commission v. Smith*, 68 S.E.2d 497, 500

(Va. 1952), the Supreme Court of Virginia articulated a two-factor test to determine whether

an entity is a municipal corporation entitled to sovereign immunity. First, "how many

attributes of a municipal corporation does the entity in dispute possess?" *Id.* Second, "in the

light of this initial consideration, what is the particular purpose for which it is sought to

determine whether or not a municipal corporation is present?" *Id.*

The *Hampton Roads* court identified six attributes of a municipal corporation considered

in the first part of the test:

(1) Creation as a body corporate and politic and as a political subdivision of the
    Commonwealth;
(2) Creation to serve a public purpose;
(3) Power to have a common seal, to sue and be sued, to enter into contracts to acquire,
    hold, and dispose of its revenue, personal, and real property;
(4) Possession of the power of eminent domain;
(5) Power to borrow money and issue bonds which are tax exempt, with interest on
    such bonds enjoying the same status under tax laws as the interest on bonds of
    other political subdivisions of the state; and
(6) Management of the corporation vested in a board of directors or a commission.

*Haleem*, 2017 WL 4400767, at *4 (quoting *City of Richmond v. Richmond Metro. Auth.*, 172 S.E.2d

831, 832 (Va. 1970)). The attributes "focus on elements necessarily contained in the enabling

legislation" and "are designed to assist the finder of fact in determining whether the entity is a municipal corporation, 'clothed with [the] essential powers to serve as a political subdivision of the Commonwealth,' or 'a mere auxiliary of a city or county government.'" *Fines*, 876 S.E.2d at 925 (quoting *Hampton Roads*, 68 S.E.2d at 500).

"[I]t is now well-settled that an entity need not possess all six *Hampton Roads* attributes to qualify as a municipal corporation." *Funkhouser*, 2024 WL 3572311, at *10; *see Fines*, 876 S.E.2d at 925 ("It is not essential that an entity possess all of these attributes to qualify as a municipal corporation; rather, we have held that an entity may be deemed a municipal corporation if it possesses *enough* of the essential attributes." (cleaned up)).  Most courts generally agree that regional jails lack two of the six attributes of municipal corporations: (1) creation as a body corporate and politic and as a political subdivision of the Commonwealth; and (2) possession of the power of eminent domain.  *See, e.g., Davis*, 2023 WL 6565288, at *9. Where courts differ is in whether they deem the absence of these two factors to be fatal to the municipal corporation inquiry.  *See id.*

The courts in the Western District of Virginia have so far held that it is not.  In *Fines*, the Virginia Supreme Court held that a community services board also lacked the two elements a regional jail lacks—it was not a political subdivision and did not have the power of eminent domain.  876 S.E.2d at 925–26.  After determining which attributes the board possessed, the court did not indicate that any one attribute was dispositive to the inquiry.  "Instead, the court noted that the appropriate inquiry for assessing the missing attributes is that 'the more statutory autonomy the entity possesses and exercises the more likely it is to be declared a

municipal corporation.'" *Funkhouser*, 2024 WL 3572311, at *11 (quoting *Fines*, 876 S.E.2d at 926). The court ultimately decided that the community services board "look[ed] less like a municipal corporation and more like an auxiliary of the establishing localities." *Fines*, 876 S.E.2d at 926. The cases from the Western District of Virginia that have examined this reasoning have unanimously determined that this analysis does not render any of the six attributes dispositive. *See, e.g.*, *Haleem*, 2017 WL 4400767, at *4–5. This court agrees.

The court also agrees with the *Funkhouser* court that RSW exhibits "many characteristics typical of local governments," including "a quintessentially public purpose, a governing body, the ability to acquire property, appoint officers and employees, make contracts, undertake various projects, accept governmental grants and loans, and sue and be sued, arrest powers, the ability to issue tax-free bonds, immunity from taxation, and state reimbursement for construction and operational costs and funding for part of employee salaries." *Funkhouser*, 2024 WL 3572311, at *12 (internal quotation marks omitted). These characteristics "weigh in favor of a finding that RSW is a municipal corporation on the first part of the *Hampton Roads* inquiry." *Id.*

The second part of the *Hampton Roads* test asks the court to consider the specific function at issue in the case. *See* 68 S.E.2d at 500. "A municipal corporation, like a city or town, is only immune from suit when it acts in a 'governmental,' as opposed to a 'proprietary' capacity." *Dowdy v. Pamunkey Reg'l Jail Auth.*, No. 3:14-cv-003-JAG, 2014 WL 2002227, at *3 (E.D. Va. May 15, 2014) (citing *Trans., Inc. v. City of Falls Church*, 254 S.E.2d 62, 63 (Va. 1979)). Because "[t]he Virginia Supreme Court has clearly held that the operation of a jail is a

- 18 -

governmental function, for which a municipal corporation is immune from suit," the court finds RSW is entitled to sovereign immunity. *Id.* (citing *Franklin v. Town of Richlands*, 170 S.E. 718, 719 (Va. 1933)); *see also Funkhouser*, 2024 WL 3572311, at *12 (same); *Haleem*, 2017 WL 4400767, at *3 (same).

### 2. *Sovereign Immunity as to Individual Defendants*

Because RSW is not a defendant in this case, the "ultimate issue" is whether RSW's sovereign immunity extends to the facility's medical staff. *Funkhouser*, 2024 WL 3572311, at *13; *see Tilson*, 2019 WL 6902677, at *7 ("The determination that MRRJA is immune from suit does not automatically dictate that MRRJA employees are similarly immune.").

The Supreme Court of Virginia has articulated a four-part test to determine whether sovereign immunity extends to the employees of a protected entity. Pursuant to this test, the court must consider "(1) the nature of the function performed by the employee, (2) the extent of the state's interest and involvement in that function, (3) the degree of control exercised by the state over the employee, and (4) whether the alleged negligent act involved judgment and discretion." *Dowdy*, 2014 WL 2002227, at *4 (quoting *Messina*, 321 S.E.2d at 663).

"Application of [this] test, however, presupposes that the [defendant] seeking the protection of sovereign immunity is an employee or agent of the Commonwealth." *Atkinson v. Sachno*, 541 S.E.2d 902, 904–05 (Va. 2001). Sovereign immunity is unavailable to defendants meeting the definition of an "independent contractor" in Virginia. *Ogunde v. Prison Health Servs., Inc.*, 645 S.E.2d 520, 523–25 (Va. 2007) (finding prison physicians were independent contractors and therefore not entitled to sovereign immunity). Unless "the evidence admits

of but one conclusion," the question of whether a defendant is an employee or an independent contractor "is generally a question of fact for a jury." *Atkinson*, 541 S.E.2d at 905 (quoting *Hadeed v. Medic-24, Ltd.*, 377 S.E.2d 589, 594 (Va. 1989)).

At the outset, Yanez argues that she did not allege in her complaint that Caruso-Wilson, Henson, or Palmer were employees of RSW. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 6 n.1 (Dkt. 25) ("First, these Defendants, like Defendant Walker, ask the Court to presume that they are employees of RSW despite the absence of any allegations regarding their status as employees.").) Rather, Yanez contends that "the information available at the time of this filing strongly suggests that the Defendants were just as likely to have been employees of an independent, private correctional contractor." (*Id.*) Yanez additionally argues that "there are no allegations or facts upon which the Court can determine the Defendants' degree of permitted discretion or judgment as it relates to the allegations in the Complaint." (*Id.*)

The court agrees with Yanez that the record requires additional factual development before the Defendants' entitlement to sovereign immunity can be determined. Yanez's complaint does not name the employment relationships between each Defendant and RSW, nor does it describe these relationships in sufficient detail for the court to determine whether Caruso-Wilson, Henson, or Palmer were employees or independent contractors of RSW. Accordingly, the threshold question of whether to apply Virginia's four-part test at all has not yet been answered. Because the evidence does not "admit[] of but one conclusion," the court will not extend sovereign immunity to the Defendants at this stage. *Cf. Funkhouser*, 2024 WL 3572311, at *14 (refusing to extend sovereign immunity on a motion to dismiss because

- 20 -

"additional development of the factual record [wa]s required" to determine whether prison

employees "exercised discretion and judgment" in complying with prison policies).

Accordingly, the court will deny Defendants' motion to dismiss as to the state-law claim.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 21) will be **DENIED**.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this <u>20th</u> day of December, 2024.

/s/ *Jasmine H. Yoon*

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE